IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| SABRINA C. JACKSON, | ) | |
| | ) | |
|    Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
|    v. | ) | 2:14cv18-MHT |
| | ) | (WO) |
| STATE OF ALABAMA | ) | |
| DEPARTMENT OF CORRECTIONS; | ) | |
| KIM T. THOMAS, | ) | |
| individually; and LEON | ) | |
| FORNISS, individually; | ) | |
| | ) | |
|    Defendants. | ) | |

## OPINION

Plaintiff Sabrina Jackson, a former employee of the Alabama Department of Corrections ("ADOC"), filed suit against defendants ADOC, former ADOC Commissioner Kim Thomas, and ADOC Warden Leon Forniss.  Under Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. §§ 1981a, 2000e to 2000e-17), and the Equal Protection Clause (as enforced through 42 U.S.C. § 1983), Jackson sues ADOC, Thomas, and Forniss for sexual harassment. Under Title VII, she sues ADOC for race discrimination

and retaliation.  And, under the First Amendment (as enforced through § 1983), she sues Thomas and Forniss for violation of her right to free speech.  The court has original jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights) and 42 U.S.C. § 2000e-5(f)(3) (Title VII).

This cause is now before the court on the defendants' motions for summary judgment.  Summary judgment will be granted in favor of all defendants on all claims.

## I.  SUMMARY-JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The court must view the facts

2

in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted. <u>Beal v. Paramount Pictures Corp.</u>, 20 F.3d 454, 459 (11th Cir. 1994).

## II. FACTUAL SUMMARY

The following facts are taken in the light most favorable to Jackson. Jackson, an American woman of African descent, worked for ADOC as an administrative assistant. She first worked at Tutwiler Prison for Women and later was transferred to Staton Correctional Facility. After an altercation with a coworker at Staton, she was transferred briefly to the ADOC central office before being terminated.

## A. The Tutwiler Prison Statement

On February 6 or 7, 2012, while working at Tutwiler Prison, Jackson met with Associate Commissioner James DeLoach and informed him that the prisoners at Tutwiler were being mistreated, harassed, and sexually abused, and that the abuse was being covered up by the administration. DeLoach offered to transfer her to a position at Staton Correctional Facility to protect her from retaliation for reporting the mistreatment, and she agreed to the transfer. Later that day, she heard DeLoach say to Commissioner Thomas, "let me speak to you about what Ms. Jackson has just informed me of what was going on at Tutwiler." Jackson Deposition (doc. no 31-2), at 83:9-14. DeLoach and Thomas went into DeLoach's office, and Jackson heard nothing further. Soon thereafter, she was transferred to Staton.

Jackson did not complain to anyone else about the conditions at Tutwiler Prison until May 25, 2012, when

she emailed Commissioner Thomas about the conditions
for prisoners at Tutwiler.


## B. The Sexual Harassment

Beginning immediately after her transfer to Staton
Correctional Facility, and throughout her approximately
three-month tenure there, Jackson had a troubled
relationship with her supervisor, Warden Forniss.  On
three or four occasions, Forniss called her into his
office and asked her to sit near him on the same side
of his desk.  "At that point," she testified, "he would
pull his pants leg tight, have a seat in his chair,
where the pants sit tight around his genitals.  Then he
would turn his chair directly facing me."  Jackson
Deposition (doc. no 31-2), at 43:21-44:1.  She
repeatedly told him that she did not feel comfortable
sitting there and that she would "prefer to sit on the
other side of the desk" if Forniss chose to sit in that
way.  Id., at 45:15-16.  Forniss responded: "Sit like

what?  This is how men sit." Id., at 45:17-18.  On at
least one occasion when she protested, he told her she
was being insubordinate.

On two other occasions, Forniss approached Jackson
from behind while she was working at her desk and got
so close to her that she could feel his breath on her
neck.  This made her uncomfortable.  Also, on four
separate occasions, he commented that he liked the way
she smelled or what she was wearing.  She rebuffed him
each time, using various tactics.  For example, she
mentioned her husband, to which he replied that he was
also married.  She also expressed to Forniss her
discomfort with his comments and her view that such
things should not happen in the workplace.
Nevertheless, Forniss continued.  Eventually, Forniss's
behavior devolved to rudeness and hostility toward her.
Rather than making suggestive comments, he made
comments to the effect that she was incompetent.  She
described one such occasion on which she went to

6

Forniss's office and mentioned having a technical problem with her computer.  He replied, "It's not the computer; it's just the person operating it."  <u>Id</u>., at 49:22-23.

On May 4, 2012, Jackson told Warden Patricia Hood, a supervisor at Staton, about Forniss's behavior.  By that time, all suggestive comments and acts giving rise to Jackson's sexual-harassment claim had ceased.  She did not report the harassment to anyone else until the day she received notice of termination, June 25, at which point she reported the harassment to Commissioner Thomas.


### C. The Altercation

On the same day she told Warden Hood about Forniss's harassment, Jackson got into a physical altercation with Tracy McMahon, a white coworker at Staton Correctional Facility.  Jackson gave the following version of events leading to the altercation.

7

Hood told Jackson to get a set of keys from McMahon, but, when Jackson asked for the keys, McMahon refused to give them to her.   McMahon then started walking toward the business office, and Jackson followed her. Jackson saw the keys in the office and reached for them, but McMahon snatched the keys before she could reach them.   Jackson told McMahon that Hood had told her to get the keys.   McMahon then began to point her finger in Jackson's face, called her "bitch" and other offensive names, and tried to hit her.   Investigative Report (doc. no. 31-8), at 35..   Jackson put her hands up in a defensive posture, which caused McMahon to fall backward into and hit her head on a filing cabinet. McMahon sustained a sizeable gash on her head and had to go to the hospital and get five stitches.   Three days later, Jackson was transferred to the ADOC central office.

Errick Demus of ADOC's Investigations and Intelligence Division investigated the incident.   The

story told by McMahon and other witnesses was different from Jackson's.   McMahon asserted that Jackson was the aggressor in the incident and that Jackson had intentionally pushed her into the filing cabinet. McMahon did admit telling Jackson that she was "acting like a bitch" but denied trying to hit her. Investigative Report (doc. no. 31-8), at 3.   Another coworker, Artina Jones, told the investigator that immediately after the incident, Jackson told her that "[McMahon] called me a bitch, ... nobody calls me a bitch, [so] I pushed her ass into the filing cabinet." Id., at 2-6, 19.   Demus's investigation concluded that Jackson was the aggressor.


## D. Termination

A couple weeks later, after Demus submitted his report and conclusions that Jackson was the aggressor, Forniss requested that Jackson be dismissed.   His request was sent to Associate Commissioner DeLoach and

9

to the director of personnel, both of whom approved it.
Jackson received a notice of pre-dismissal conference
on June 25 and that day notified Commissioner Thomas
that Forniss had sexually harassed her.   Demus then
investigated the sexual-harassment allegations but
concluded that there was nothing to substantiate them.

Jackson had a pre-dismissal conference chaired by
Associate Commissioner Grantt Culliver, at which she
had the opportunity to tell her side of the story.
Following the hearing, Culliver recommended that
Jackson be terminated, and DeLoach and Commissioner
Thomas approved the recommendation of dismissal.

Although Commissioner Thomas is white, many of the
people involved in Jackson's termination, including
investigator Demus, Wardens Forniss and Hood, Associate
Commissioners DeLoach and Culliver, and witness Artina
Jones, are black.

10

### III.  ANALYSIS

As stated, under Title VII and the Equal Protection Clause (as enforced through § 1983), Jackson sues ADOC, Thomas, and Forniss for sexual harassment; under Title VII, she sues ADOC for race discrimination and retaliation; and, under the First Amendment (as enforced through § 1983), she sues Thomas and Forniss for violation of her right to free speech.  The court will first examine each set of claims in turn.

### A. Sexual-Harassment Claims

Jackson claims sexual harassment against all three defendants.  Against ADOC, she proceeds under Title VII.  Against Thomas and Forniss, she proceeds under the Equal Protection Clause of the Fourteenth Amendment, as enforced through 42 U.S.C. § 1983. Because the elements and analysis of sexual-harassment claims are identical under Title VII and the Equal Protection Clause, see Hardin v. Stynchcomb, 691 F.2d 1364, 1369, n.16 (11th Cir. 1982) (analyzing the

11

elements of a § 1983 Fourteenth Amendment equal-protection claim in parallel with a Title VII claim because they are equivalent), the court will jointly analyze both claims under the applicable Title VII case law.

Jackson proceeds under two theories of sexual harassment: hostile-work environment and tangible-employment action. The court addresses each theory below.

### 1. Hostile-Work Environment

To prove a hostile-work-environment claim, an employee must show (1) that she is a member of a protected group; (2) that she has been subject to "unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment [was] based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and

12

conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable." Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc).

Jackson, as a woman, is a member of a protected class, and she has shown that Forniss's conduct was unwelcome. Taking the evidence in the light most favorable to Jackson, she has shown that Forniss subjected her to sexual advances and conduct of a sexual nature because of her sex: he directed her to sit close to and directly facing him after purposefully tightening his pants around his crotch; approached her from behind while she was sitting at her desk and came so close that she could feel his breath on the back of her neck; repeatedly commented on her appearance and smell; and continued doing so even after she made clear to him that she felt his actions were inappropriate and

13

made her uncomfortable.[1]  However, Jackson cannot show that the harassment she experienced was "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment."  Id.

A court may consider four factors to determine whether, considering the totality of the circumstances, harassment was sufficiently severe or pervasive to objectively alter the employee's terms or conditions of employment: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere

---

1. In her response in opposition to the first motion for summary judgment, Jackson contends for the first time that part of the factual underpinning of her hostile-work-environment theory is that she saw the female prisoners treated poorly at Tutwiler Prison. However, her amended complaint did not assert this exposure as a basis for her sexual-harassment claims, which focused entirely on Forniss's actions at Staton, and, as a result, the magistrate judge's recommendation construing the complaint did not either.  Admittedly, she filed the complaint pro se, but after retaining counsel, she did not seek to amend her complaint.  As it is too late to bring this new theory to the fore, the court will not address it here.

offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Mendoza, 195 F.3d at 1246 (internal citations omitted); see also Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 509 (11th Cir. 2000) (applying the four factors). As stated, this is an objective test: the key is how a reasonable person would experience the complained-of actions, not how the plaintiff subjectively experienced them. The four factors are not applied with mathematical precision; the court must weigh them in light of the specific circumstances of a case, and the mere presence or lack of one factor is not dispositive. See, e.g., Johnson, 234 F.3d at 509 (finding severe or pervasive harassment where supervisor made numerous sexual comments to employee, repeatedly acted in an obscene manner while calling her name, repeatedly attempted to massage her shoulders against her will, and inappropriately rubbed his body parts against her);

15

Mendoza, 195 F.3d at 1247-52 (finding harassment was not severe or pervasive where supervisor frequently followed, watched, and looked employee up and down in what she viewed as a sexual manner, once brushed his hip against her hip while walking by her and then smiled, made an ambiguous remark that she viewed as sexual, and on a few occasions while looking her up and down, made a sniffing motion when he looked at her private area).

Viewing the totality of the circumstances here, the court holds that the alleged harassment was not sufficiently severe or pervasive to rise to the level of a hostile-work environment. Jackson worked for Forniss for about three months. Jackson alleges that, on three or four occasions during part of that period, Forniss asked her to sit near him after tightening his pants around his crotch and that, on two more occasions, he got close enough to her to feel his breath on the back of her neck. On about four more

16

occasions, he told her that she looked good or smelled good. Taking the evidence in the light most favorable to Jackson, the court is informed that she alleged about ten separate events during less than three months, which is not infrequent. However, Forniss's actions were not sufficiently severe to constitute actionable sexual harassment. While he engaged in some arguably offensive behavior, he did not try to touch or grab her, did not proposition her, and did not use any vulgar or sexually degrading language. Cf. Johnson, 234 F.3d at 506. Forniss's actions were not physically threatening or sufficiently humiliating, and his comments about her appearance and smell constituted, at most, offensive utterances. Finally, while Forniss told her at least once that she was being insubordinate for complaining and at some point began making critical comments to her, Jackson presented no evidence that this behavior actually interfered with her job performance. In sum, Jackson cannot establish that

17

Forniss's actions were sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment. Therefore, summary judgment is due to be granted in favor of all three defendants on Jackson's hostile-work-environment theory.

### 2. Tangible-Employment Action

Jackson also proceeds under a theory of sexual harassment resulting in a tangible-employment action: that is, she contends that she was terminated because she refused to comply with Forniss's sexual advances. See, e.g., Hulsey v. Pride Restaurants, LLC, 367 F.3d 1238, 1245-47 (11th Cir. 2004) (analyzing sexual-harassment claim based on tangible-employment-action theory). However, to succeed on this theory, there must be a causal link between her refusal to submit to his sexual advances and her termination. Baldwin v. Blue Cross/Blue Shield

of Alabama, 480 F.3d 1287, 1300 (11th Cir. 2007); see also Frederick v. Sprint/United Management Co., 246 F.3d 1305, 1312-13 (11th Cir. 2001). Jackson cannot show this causal link. Indeed, no reasonable jury could conclude that she was terminated because she refused to submit to Forniss's sexual advances. Accordingly, she cannot succeed on this theory.

In Frederick, the plaintiff sued for sexual harassment on a tangible-employment-action theory. Although she alleged that she was denied a promotion for which she was qualified because she refused to submit to her supervisor's sexual advances, the Eleventh Circuit Court of Appeals nonetheless affirmed the district court's grant of summary judgment in favor of the employer. 246 F.3d at 1312-13. The plaintiff had failed to rebut the employer's proffered evidence that it had refused to promote her for reasons independent of her qualifications for the job; specifically, the court noted that the employer had

19

shown that she had a history of attendance problems and that her supervisors believed she needed more time to develop before advancement. Id. Because the plaintiff had failed to rebut this evidence, she had failed to show a causal link, and summary judgment was proper. Id.

Jackson has not put forth sufficient evidence to establish a causal link between her termination and her rejecting Forniss's advances. While Forniss did request her termination after Jackson had rejected his advances, he did not do so until after an independent investigation determined that she had intentionally assaulted and injured a coworker. The investigation report presented overwhelming evidence that Jackson had physically attacked a coworker causing serious injury. The injuries McMahon sustained were well documented. McMahon claimed that Jackson initiated the altercation and intentionally pushed her into the filing cabinet. Other witnesses corroborated all or part of McMahon's

version of events. Coworker Artina Jones, in a recorded statement to the investigator, reported that Jackson admitted shortly after the fight that she had intentionally pushed McMahon into the filing cabinet because McMahon called her 'bitch.' Another employee reported that she saw Jackson come up behind McMahon in an agitated manner and saw McMahon attempt to avoid Jackson by going around her and into the office where the violence occurred and that Jackson followed closely behind McMahon into the office. Warden Hood claimed that Jackson lied about being told to go get the keys from McMahon in the first place. The evidence against Jackson was, as stated, simply overwhelming.

Thomas, DeLoach, Culliver, Forniss, and the others involved in the decision had before them this clear evidence of a serious offense when they decided to terminate Jackson. Given such clear and overwhelming evidence that she initiated an altercation and seriously injured another employee, any reasonable

employer would have terminated her.   And while Jackson
denies that she assaulted McMahon, her denial is of
little moment: the key issue is whether the employer
reasonably believed the employee committed the
violation.   See Elrod v. Sears, Roebuck & Co., 939 F.2d
1466, 1469-72 (1991) (overturning verdict for plaintiff
in termination case because evidence showed supervisors
believed that plaintiff was guilty of harassment, and
this belief was the reason behind his discharge); Damon
v. Fleming Supermarkets of Florida, Inc., 196 F.3d
1354, 1363 n.3 (11th Cir. 1999) ("An employer who fires
an employee under the mistaken but honest impression
that the employee violated a work rule is not liable
for discriminatory conduct.").   Here, it was undeniably
clear that Jackson had assaulted McMahon.   Under these
circumstances, no rational jury could conclude that
Jackson was terminated for refusing Forniss's sexual
advances.

For these reasons, summary judgment will be granted in favor of all three defendants on Jackson's sexual-harassment claims.


### B. Title VII Race-Discrimination and Retaliation Claims

Against ADOC, Jackson claims that, in violation of Title VII, she was terminated because of her race and in retaliation for complaining about the treatment of the female prisoners at Tutwiler.[2]  Courts analyzing discrimination and retaliation claims under Title VII often apply the <u>McDonnell Douglas</u> burden-shifting framework.  <u>See McDonnell Douglas Corp. v. Green</u>, 411

---

2. One might very liberally read the amended complaint to claim retaliation in violation of Title VII also based on Jackson's complaints about Forniss's sexual harassment, but earlier the magistrate judge interpreted the amended complaint to state a Title VII retaliation claim based only on her reports of the Tutwiler prisoner abuse, and Jackson did not object to this characterization.  Regardless of the interpretation, however, the outcome is the same.

Also, the court need not address whether Title VII covers a claim of retaliation based on the abuse of female prisoners because it resolves the retaliation claim on other grounds.

23

U.S. 792, 800-06 (1973) (applying burden shifting in Title VII race-discrimination case); <u>Hairston v. Gainesville Sun Publ'g. Co.</u>, 9 F.3d 913, 919 (11th Cir. 1993) ("The burden of proof in Title VII retaliation cases is governed by the framework established in <u>McDonnell-Douglas</u> ...."). Under this approach, the plaintiff first attempts to establish a prima-facie case of discrimination or retaliation.[3] Once the plaintiff has established a prima-facie case, a presumption of illegal action arises, and the burden shifts to the employer to rebut it. The employer may rebut the presumption by "clearly articulating in a

_____

3. A prima-facie case of discrimination or retaliation can be established in a variety of ways, depending on the facts present in a particular case. <u>See, e.g.</u>, <u>Jones v. Gerwens</u>, 874 F.2d 1534, 1540 (11th Cir. 1989) (setting forth two ways to establish prima-facie case of discriminatory discharge in case involving violation of work rules); <u>Brungart v. BellSouth Telecommunications, Inc.</u>, 231 F.3d 791, 798 (11th Cir. 2000) (a prima-facie case of retaliatory discharge is established by employee showing "that (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected conduct and the adverse employment action.").

reasonably specific manner a legitimate non-discriminatory [and non-retaliatory] reason for the discharge." Conner v. Fort Gordon Bus Co., 761 F.2d 1495, 1499 (11th Cir. 1985); see also Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998) (same in retaliation context).

On a race-discrimination claim based on disparate treatment, the plaintiff bears the ultimate burden of demonstrating with "significant probative evidence" that the employer's explanation is pretext and that race was a likely a factor in the treatment she experienced. See Elrod, 939 F.2d at 1470. On a Title VII retaliatory-discharge claim, the plaintiff bears the ultimate burden of showing that she would not have been terminated but for the retaliatory motive. See Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation ....").   But when either claim is

25

justified by disciplinary action for violation of a work rule, the critical issue is not whether the employee committed the alleged violation; instead, it is whether the employer had a good-faith belief that the employee had committed the violation.  See <u>Jones v. Gerwens</u>, 874 F.2d 1534, 1540 (11th Cir. 1989) ("The law is clear that, even if a Title VII claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any prima-facie case of disparate treatment by showing that it honestly believed the employee committed the violation."); <u>Damon v. Fleming Supermarkets of Florida, Inc.</u>, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999) ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct."); <u>see also</u> <u>Nix v. WLCY Radio/Rahall Commc'ns</u>, 738 F.2d 1181, 1187 (11th Cir. 1984) (Title VII does not "require the employer to have good cause for its decisions.  The employer may fire an

26

employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.")

Here, even assuming that Jackson has established a prima-facie case for each claim, the court holds that her claims fail because she has not shown that the defendants' reason for terminating her was pretextual. ADOC proffered a legitimate, nondiscriminatory and nonretaliatory reason for terminating Jackson: she was involved in a fight in which she was the aggressor and caused significant injuries to a coworker.  Though Jackson alleges that most of the witnesses against her lied, what is critical is whether ADOC's leaders had a good-faith belief that she had assaulted her coworker. As discussed above, overwhelming evidence--including her confession to a co-worker shortly after the event--supported the conclusion that Jackson had intentionally attacked and injured her coworker.

Presented with the investigative report, ADOC's leaders reasonably believed that she had committed this serious offense. Furthermore, the offense clearly merited termination: any reasonable employer would terminate an employee who had seriously injured another employee after initiating an altercation. Accordingly, the defendants' reasonable belief that Jackson had assaulted her colleague overcomes her prima-facie case of discrimination and retaliation.

For the same reasons, Jackson has not met her ultimate burden of showing that the she would not have been terminated but for her complaints about the prisoners at Tutwiler. The defendants had, as stated, overwhelming evidence that Jackson had committed a serious rule violation, one for which any reasonable employer would terminate her. Given the seriousness of the offense, Jackson simply cannot show that ADOC would not have terminated her but-for her complaints.

28

Nor has Jackson demonstrated that race was probably a factor in her termination. As evidence of race discrimination, Jackson points out that McMahon, who is white, was not disciplined as harshly as Jackson for her involvement in the altercation. However, as stated, the evidence was simply overwhelming that Jackson was the one primarily at fault. Because their culpability for and involvement in the incident was not the same, the difference in punishment is justifiable; accordingly, that difference does not alone prove racial discrimination.

Moreover, while not dispositive, it is noteworthy that many, if not most, of the key players involved in her termination are black: investigator Errick Demus; witnesses Artina Jones and Warden Hood; Warden Forniss, who recommended her termination; Associate Commissioner Culliver, who oversaw her termination hearing; and Associate Commisioner DeLoach, who recommended her termination.

For all of the above reasons, the court further
finds that no reasonable jury could conclude either
that Jackson was terminated based on race or that she
would not have been terminated but for retaliation for
her complaint about the prisoners.   Accordingly,
summary judgment will be granted in favor of ADOC on
Jackson's Title VII race-discrimination and retaliation
claims.


## C. First Amendment Retaliation Claim

Jackson also claims that, in violation of the First
Amendment, Thomas and Forniss terminated her in
retaliation for complaining about Forniss's alleged
sexual harassment and for reporting the abuse of the
female prisoners at Tutwiler.

A public employee may not be discharged in
retaliation for speech protected under the First
Amendment.   <u>See</u> <u>Bryson v. City of Waycross</u>, 888 F.2d
1562, 1565 (11th Cir. 1989).   Whether an employee

30

suffered such retaliation is determined by a four-part test:

> "First, a court must determine whether the employee's speech may be fairly characterized as constituting speech on a matter of public concern. If so, the district court must weigh the employee's first amendment interests against the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees. Should the employee prevail on the balancing test, the fact-finder determines whether the employee's speech played a 'substantial part' in the government's decision to demote or discharge the employee. Finally, if the employee shows that the speech was a substantial motivating factor in the employment decision, the state must prove by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct."

Morgan v. Ford, 6 F.3d 750, 754 (11th Cir. 1993) (internal citations and quotation marks omitted).

Even assuming that Jackson's complaints are a matter of public concern, that she prevails on the balancing test, and that her speech was a substantial

motivating factor in her termination, Jackson cannot succeed on this retaliation claim. For as discussed above, no reasonable employer would allow an employee who had intentionally attacked and injured another employee to remain employed, and the defendants had overwhelming evidence that Jackson had done so. Therefore, Jackson has failed to rebut the defendants' showing that they would have terminated her even in the absence of her complaints. In addition, the court finds as a matter of law that a reasonable jury would have to conclude, by a preponderance of the evidence, that the defendants would have terminated Jackson even in the absence of her complaints.

Accordingly, summary judgment will be granted in favor of Thomas and Forniss on Jackson's First Amendment claim.

* * *

For the above reasons, summary judgment will be granted in favor of all defendants on all of Jackson's claims.

An appropriate judgment will be entered.

DONE, this the 5th day of May, 2015.


       /s/ Myron H. Thompson
      UNITED STATES DISTRICT JUDGE